IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERALD CAMP, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | No. 19- |
| CITY OF PHILADELPHIA and PHILIP NORDO, | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1. Defendant City of Philadelphia ("the City") has an obligation to oversee the manner in which Philadelphia Police Department ("PPD") detectives recruit and use informants in support of criminal investigations. Consistent with that responsibility, the City also has an obligation to investigate complaints alleging that detectives have abused their power and committed constitutional violations in the course of recruiting and using informants.

2. The PPD Internal Affairs Division ("IAD") is an entity which is supposed to ensure the credible investigation of such allegations and the imposition of appropriate discipline. For years, however, the City has been aware that IAD has been ineffective in investigating and curtailing abuses of powers and constitutional violation with respect to the recruitment and use of informants.

3. As of 2005, the City was aware of credible complaints that defendant Philip Nordo, a PPD detective, had engaged in stunning misconduct with informants: grooming criminal suspects and potential informants for future sexual relationships. In his dealings with

these suspects and informants, Nordo promised leniency or reward money, used threats and coercion, and engaged in sexual assault. Despite its awareness of facts demonstrating this disturbing—and patently unlawful—pattern of behavior, the City failed to train, supervise, or discipline defendant Nordo. Instead, the City allowed defendant Nordo's conduct to continue unabated and, shockingly, promoted him to serve as a detective in the PPD's most prestigious investigative unit, the Homicide Division.

4. In June 2015, Plaintiff Gerald Camp became collateral damage in defendant Nordo's attempts to groom yet another informant. As a result of defendant Nordo's attempts to curry favor with a new sexual conquest, homicide suspect and witness R.F., Mr. Camp was charged and imprisoned on fabricated allegations. Nordo and R.F. conspired to jointly accuse Mr. Camp of illegally possessing a firearm, which, in reality, belonged to R.F. Their actions caused Mr. Camp's prosecution and conviction.

5. After Mr. Camp's conviction, his criminal defense counsel at the Defender Association of Philadelphia conducted extensive investigation into the nature of Nordo's relationship with R.F. and reached the conclusion that Nordo and R.F. were engaged in a sexual relationship. Mr. Camp's counsel presented their findings to the District Attorney's Office, which immediately agreed to vacate Mr. Camp's conviction and withdraw the charges. By that time, Mr. Camp had been imprisoned for 22 months.

6. Mr. Camp brings this action against the City and Nordo under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as supplemental claims under state law, seeking compensation for his extraordinary harms and losses.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

8. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) in that the defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that gave rise to this action occurred within the Eastern District of Pennsylvania.

## III. PARTIES

9. Plaintiff Gerald Camp, age 31, is and was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

10. Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the PPD, which, at all times relevant to this complaint, employed defendant Philip Nordo.

11. Defendant Philip Nordo was at all relevant times employed as a detective with the PPD. He is sued in his individual capacity.

12. At all times relevant to this Complaint, the defendants acted under color of state law.

## IV. FACTUAL ALLEGATIONS

### A. The City's Responsibility to Supervise, Train, and Discipline its Officers Regarding the Use of Informants

13. The City has a responsibility to supervise PPD personnel and prevent the misuse and abuse of criminal informants – suspects who themselves provide information to police in criminal cases.

14. The City is aware that the use of informants implicates multiple risk factors: informants may be looking for consideration in a pending criminal case, they may be seeking financial rewards, they may be seeking to avoid arrest for their own future criminal conduct, and/or they may be seeking revenge against persons they do not like. As the City knows, these factors may result in false criminal accusations against innocent individuals.

15. The City is aware that training, supervision, and discipline regarding the use of informants is necessary to guard against the risk of false prosecutions against innocent individuals.

16. The City is also aware that personal relationships, including intimate relationships, between officers and informants are inappropriate and are likely to result in false information being provided in police reports and in courtroom testimony.

### B. The PPD's Established History of Improper Informant Practices

17. From at least as early as the 1980s continuing through to late 2017, there has been a custom and practice among PPD personnel of misusing informants – providing them with undocumented or inappropriate incentives, including financial rewards; developing inappropriate personal relationships with them; using threats or coercion to encourage informants to provide information; and providing false information in police reports or testimony regarding information allegedly gathered from informants.

18. In the 1990s, the public became aware of a custom and practice among PPD officers in the 39th Police District of misusing informants. As part of the practice, which started in the 1980s, Officer Thomas Ryan and a group of fellow officers paid Pamela Jenkins, an informant, $500 to testify falsely as the sole prosecution witness in a homicide trial. As investigations later revealed, Jenkins had an intimate, romantic relationship with Ryan.

19. These practices continued in other PPD units into the 2000s. From approximately 2005 to 2009, narcotics officer Jeffry Cujdik used Benny Martinez as an informant. Cujdik made newspaper headlines for his personal relationship with Martinez and other informants, including renting a house to one, providing cash to bail another out of jail, and providing them with personal gifts. Cujdik also used his informants as a basis for false search warrant applications and cited evidence allegedly supplied by informants in support of in-court testimony. An FBI investigation of Cujdik and fellow narcotics squad members resulted in the federal indictment of multiple PPD officers.

20. In approximately May 2010, PPD Officer Chris Hulmes used threats and violence to pressure Joshua Torres, a suspected drug dealer, to become an informant and provide police with information about other drug dealers. Hulmes failed to follow a newly written police directive regarding the use and registration of informants. In late 2011 or early 2012, Hulmes testified falsely in court regarding an arrest that he made using information provided by Torres.

21. In May 2017, Inspector Raymond Evers instructed officers working under his supervision to turn narcotics suspects into off-the-book informants, not to register them in accordance with police directives, and to falsify paperwork in order to protect their source of information. Evers was a 25-year veteran of the PPD and, at the time, had supervisory authority over the narcotics unit.

22. Each of these instances resulted in scandals widely reported in local media. Each instance resulted in the withdrawal of charges in scores of criminal cases. Yet, following each instance, the City failed to take appropriate remedial action to prevent the continuation of such unlawful practices among PPD officers.

23. These instances demonstrate a policy, practice, and custom among PPD personnel of misusing informants and falsifying paperwork and testimony in furtherance of the cultivation and misuse of informants.

### C. The City's Deliberate Indifference to the Need to Train, Supervise, and Discipline Police Personnel to Prevent Misuse of Informants

24. At all times relevant to this complaint, and for many years before and thereafter, the City has been deliberately indifferent to the need to train, supervise, and discipline police officers regarding the use and misuse of informants. The City, either through the PPD's IAD or through any other internal auditing process, has failed to provide an internal mechanism that imposes meaningful supervision, monitoring, disciplinary and/or remedial actions regarding the use, misuse, or abuse of informants.

25. For example, with regard to the actions of Officer Ryan and other 39th District officers in the 1980s and 1990s, the City disregarded credible complaints to IAD and the District Attorney, engaged in deliberately biased internal investigations, and engaged in a practice and custom of exonerating police officers regardless of the evidence of misconduct. The systemic and unconstitutional customs and practices of Ryan's 39th District squad were ended only after the FBI conducted a thorough investigation and federal officials prosecuted the involved officers. As a result of these practices, a Judge sitting in this Court entered a Consent Decree requiring wide ranging reforms in the PPD, and, in particular, providing for specific limitations on the PPD's investigative practices and policies. *See NAACP v. City of Philadelphia*, No. 96-cv-6045. As part of the Consent Decree, the City agreed to ensure compliance with existing directives related to the monitoring and oversight of informants.

26. In July 2002, a report from PPD's Integrity and Accountability Office, then headed by now-Judge Ellen Green-Ceisler, assessed the PPD's monitoring of informants and

found that PPD engaged in only minimal supervision. According to the report, supervisors were not properly conducting quarterly reviews of informant use as required under then-existing police directives. Green-Ceisler wrote in the report, "In an important IAD investigation...nearly every procedural safeguard required for using a [confidential informant] was intentionally ignored and the circumstances surrounding the incident were falsified. The involved officers and supervisors received minimal discipline and are still assigned to the Narcotics Bureau."

27. In 2011, in litigation concerning the conduct of Officer Cujdik and his fellow officers, City officials acknowledged that they could point to no audits, reviews, investigations, or reports completed by supervising officers in the narcotics unit regarding the use of confidential informants. The failure to conduct such reviews was in direct violation of the City's previous assurances that it would improve compliance with existing police directives related to the monitoring and oversight of informants.

28. With regard to the actions of Officer Hulmes, an IAD complaint was filed regarding his coercive behavior involving his informant, Joshua Torres, in a May 2010 narcotics investigation. Yet, the IAD investigation resulted in only a written reprimand which allowed Hulmes to continue working as an active officer in his same unit. In December 2011, Hulmes admitted to lying about his use of an informant and in January 2012 a judge found that he had consistently lied during his court testimony in a matter involving the use of an informant. Again, Hulmes was permitted to remain working as an active officer and continued to testify in court. Not until 2014, after local media publicized Hulmes' acknowledged perjury, did the City remove him from duty.

29. This history demonstrates that the PPD has been deliberately indifferent to the need to supervise, train and discipline its officers, through IAD or otherwise, regarding the

misuse of informants and false reports and/or testimony resulting from the use or misuse of informants.

### D. Defendant Nordo's Shocking and Long History of Misconduct

30. At least as early as 2005, the City was aware of credible complaints that defendant Nordo, in his role as a Philadelphia police detective, groomed suspects and potential informants for future sexual relationships. In grooming these suspects and potential informants, Nordo promised leniency or reward money, used threats and coercion, and engaged in sexual assault. Nordo used his position to cause witnesses to sign false or inaccurate interview statements. He also submitted to PPD documents containing fabricated and false information in support of requests for crime reward money which he sought for distribution to informants. Despite its awareness of these credible complaints, the City failed to supervise, discipline, or train defendant Nordo.

31. In April 2005, IAD received a report that Nordo had sexually assaulted a robbery suspect in an interview room in the PPD's East Detective Division headquarters. According to that report, in the course of interviewing the robbery suspect, Nordo forced the suspect to masturbate in his presence, and Nordo kissed the suspect. The suspect ejaculated in front of Nordo, the report alleged, and Nordo gave the suspect a cigarette. The suspect also alleged that Nordo offered a way for both of them to make money. In its investigation, IAD collected evidence, including ejaculate and a cigarette butt, confirming critical components of the sexual assault complaint.

32. The 2005 complaint was referred to the District Attorney's Office, but Nordo was neither charged, nor disciplined.

33. Instead, in 2009, the City promoted Nordo to the Homicide Unit. In that assignment, Nordo continued to engage in coercive grooming and assaultive behavior, including depositing money into inmates' commissary accounts, discussing sexual acts with informants in person or over the phone, and encouraging imprisoned informants to introduce him to other inmates whom he could sexually groom.

34. As a homicide detective, Nordo was given wide latitude to transport inmates and witnesses in homicide investigations. These inmates and witnesses were Nordo's pool of victims whom he would attempt to groom for future sexual relations.

### E. The Wrongful Arrest and Conviction of Gerald Camp

35. In June 2015, Plaintiff Gerald Camp became collateral damage in defendant Nordo's attempts to sexually groom yet another informant.

36. On June 11, 2015, defendant Nordo, while working as a Philadelphia homicide detective, arrested R.F., who was a witness and a suspect in a homicide.

37. At the time of the arrest, Nordo learned that R.F. had potential evidence relevant to the homicide in his computer tablet located at the house of his sister, S.S.

38. Consistent with his long pattern of behavior dating back at least 10 years, Nordo saw an opportunity to cultivate R.F. as an informant and as a sexual conquest.

39. In the course of their conversations concerning evidence on the tablet in S.S.'s home, R.F. informed Nordo that a firearm was present in a closet in the same room where R.F. had left the tablet.

40. R.F. knew Mr. Camp, as Mr. Camp was involved in a relationship with S.S. R.F. had a personal vendetta against Mr. Camp due to a previous domestic dispute between Mr. Camp and S.S.

9

41. As part of his effort to cultivate R.F. as an informant and sexual conquest, Nordo wanted to protect R.F. from prosecution for possession of the firearm which he knew would be found in close proximity to the tablet.

42. Nordo decided to act, with R.F.'s assistance, to fabricate a story falsely alleging that the firearm in S.S.'s home belonged to Mr. Camp.

43. This story would be of mutual benefit to Nordo and R.F. It would harm Mr. Camp in support of R.F.'s personal vendetta against him. And it would protect R.F. so that Nordo could continue to groom him as an informant in other cases and as a sexual conquest.

44. Nordo and R.F., acting in concert and conspiracy, developed a plan to have Mr. Camp arrested and charged for unlawfully possessing the firearm.

45. Consistent with that plan, Nordo had R.F. call S.S. to verify that Mr. Camp was present in the house. Nordo then brought R.F. to S.S.'s house.

46. Mr. Camp was present on the first floor of the house when Nordo arrived. Nordo entered the house, searched it, and located the firearm in the closet of the second floor front bedroom, exactly where R.F. told Nordo to look. Nordo also recovered R.F.'s tablet in close proximity to the firearm.

47. S.S. told Nordo that the firearm did not belong to Mr. Camp; that Mr. Camp did not live with her; and that Mr. Camp had not been in the second floor front bedroom that day. S.S. also told Nordo that R.F. had been inside the front bedroom earlier that day and that the firearm could belong to R.F. Nordo threatened to have the Department of Human Services take S.S.'s children away because S.S. was not telling him that the gun belonged to Mr. Camp.

48. Even though the evidence indicated that the firearm belonged to R.F., Nordo, as part of the plan he developed with R.F. and in support of his intent to groom R.F. as an informant and sexual conquest, told other PPD officers at the scene that the firearm belonged to Mr. Camp.

49. Further, Nordo intentionally failed to tell other PPD officers about S.S.'s statements suggesting that the firearm actually belonged to R.F.

50. Based on Nordo's false statements, PPD officers prepared investigative reports alleging that Mr. Camp unlawfully possessed the firearm.

51. As a direct and proximate result of Nordo's actions, the reports prepared based on Nordo's false statements caused prosecutors to charge Mr. Camp with unlawful possession of the firearm.

52. At a trial on the charges, Nordo falsely testified that S.S. had informed him Mr. Camp lived in the front bedroom and the firearm belonged to Mr. Camp, despite her statements to the contrary.

53. Mr. Camp was convicted of the firearm charges.

54. As a result of Nordo's misconduct, Mr. Camp was held in prison for 22 months.

55. Over the course of those 22 months in prison, Mr. Camp's mental and physical health declined. He developed diabetes, Glaucoma, anxiety, and depression.

### F. Nordo's Inappropriate Relationship With R.F. Comes to Light

56. Following Mr. Camp's conviction, in early 2017, his criminal defense attorneys with the Defender Association of Philadelphia investigated the circumstances of R.F.'s relationship with Nordo.

57. They subpoenaed information from the Philadelphia Prison System, including recordings of R.F.'s telephone conversations.

58. Those recorded conversations provided significant evidence of an inappropriate relationship between Nordo and R.F.

59. The recordings showed that Nordo and R.F. spoke frequently.

60. In the calls, Nordo promised to intervene with a prosecutor who had brought charges against R.F. and with a Judge supervising R.F.'s probation.

61. Nordo promised to help R.F. get out of jail if R.F. cooperated with Nordo in his investigations.

62. The calls were of a deeply personal nature, with both parties commenting on, among other things, Nordo's physical appearance.

63. In one of the recorded calls obtained by Mr. Camp's counsel, R.F. expressly admitted that he caused Mr. Camp to be charged for the firearm, stating that it was either "me [R.F.] or him [Camp]" who would have to be held responsible.

64. In addition to the frequent and inappropriate conversations between Nordo and R.F., Mr. Camp's criminal defense counsel discovered other highly unusual and suspicious conduct.

65. For example, counsel learned that Nordo deposited at least $400 into R.F.'s prison commissary account.

66. Further, they learned that Nordo arranged for R.F. to be released from prison and housed in a hotel.

67. Based on Nordo's conduct over the previous ten years and in light of the circumstances of his communications and conduct with R.F., it appeared that Nordo had been engaging in a sexual relationship with R.F.

68. The time period of the phone calls, payments, and favors that Nordo provided to R.F. coincided with time period of Mr. Camp's prosecution ranging from the date of his arrest, through Nordo's testimony at Mr. Camp's preliminary hearing, at his trial, and beyond.

### G. Mr. Camp's Conviction is Vacated and a Criminal Investigation Leads to Charges Against Nordo

69. Mr. Camp's criminal defense counsel at the Defender Association of Philadelphia presented the results of their findings to the Philadelphia District Attorney's Office.

70. The parties agreed that Mr. Camp had been wrongly convicted and, on April 11, 2017, jointly asked the trial court to vacate the conviction. The court granted that relief and, on that same date, the charges were withdrawn.

71. During the next two years, the District Attorney's Office conducted a comprehensive investigation into Nordo's history of misconduct.

72. On February 19, 2019, based on evidence presented by the District Attorney's Office, an investigating grand jury in Philadelphia recommended that criminal charges be brought against Nordo for multiple counts of rape, involuntary deviate sexual intercourse, sexual assault, indecent assault, stalking, official oppression, institutional sex assault, theft by deception, and securing execution of documents by deception.

73. The grand jury's presentment concluded that Nordo had repeatedly used his power and authority as a police detective to engage in this criminal conduct.

74. News of the grand jury's recommendation was widely reported in local media.

75. In one report, a February 22, 2019, Philadelphia Inquirer article, Philadelphia Police Department Commissioner Richard Ross, the City's policymaker for purposes of police matters, admitted, "What may have happened in this case is a failure of oversight from a supervisory standpoint, in what Nordo was doing and what type of latitude that he had."

### H. Violations of Mr. Camp's Constitutional Rights

76. With respect to the firearm charges brought against him, Mr. Camp committed no crime, nor was there any legal cause to believe he had violated any federal, state or local law.

77. Defendant Nordo had no legal cause to believe that Mr. Camp committed a firearm offense.

78. By his actions in creating a false and fabricated account that Mr. Camp possessed a firearm, defendant Nordo, with malice, caused the unlawful prosecution of Mr. Camp.

79. At no time did defendant Nordo disclose to prosecutors that he had fabricated evidence to support the prosecution of Mr. Camp, nor did he disclose to prosecutors that he had engaged in an inappropriate relationship with R.F.

80. Defendant City of Philadelphia, through its deliberate indifference to longstanding practices of PPD officers' inappropriate relationships with informants, the ineffective oversight of IAD, and its failure to respond to years of credible reports of Nordo's misconduct, was a moving force in causing the violations of Mr. Camp's constitutional rights.

81. At all relevant times, as exemplified by the facts outlined above, defendant Nordo's conduct was in willful, reckless, and callous disregard of Mr. Camp's rights under federal and state law.

### V. CAUSES OF ACTION

**Count 1**
**Plaintiff v. Defendant Nordo**
**42 U.S.C. § 1983: Malicious Prosecution**

82. Defendant Nordo violated Mr. Camp's clearly established right to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the U.S. Constitution.

83. Nordo's knowing, intentional, and/or reckless false statements directly and proximately caused the prosecution of Mr. Camp on illegal firearm possession charges. Nordo caused the prosecution without probable cause and he acted with improper motive and purposes.

84. Mr. Camp suffered a deprivation of liberty as a result of the prosecution. Mr. Camp's conviction on the illegal firearm possession charges was vacated and the charges were withdrawn. The prosecution therefore terminated in Mr. Camp's favor.

**Count 2**
**Plaintiff v. Defendant Nordo**
**42 U.S.C. § 1983: Deprivation of Liberty without**
**Due Process of Law and Denial of a Fair Trial**

85. Defendant Nordo deprived Mr. Camp of his clearly established constitutional right to due process of law and to a fair trial. Nordo fabricated evidence and engaged in deliberate deception when he told other officers that R.F.'s sister stated that the firearm belonged to Mr. Camp, that Mr. Camp lived in the room where the firearm was found, and that Mr. Camp had been inside the room on the same day the firearm was found. Each of those allegations was false.

86. Nordo's statements caused the initiation of Mr. Camp's prosecution and were later used as evidence against him during his trial. As such, Nordo's conduct denied Mr. Camp's right to a fair trial and caused his unlawful conviction in violation of the Fourteenth Amendment to the U.S. Constitution.

**Count 3**
**Plaintiff v. Defendant Nordo**
**42 U.S.C. § 1983: Failure to Disclose Exculpatory**
**Evidence and Denial of a Fair Trial**

87. Defendant Nordo failed to disclose to prosecutors the nature of his relationship with R.F. and failed to disclose to prosecutors that he fabricated information in support of a

prosecution of Mr. Camp. This information was highly material and exculpatory evidence to undermine the prosecution's evidence against Mr. Camp.

88. Nordo's conduct violated Mr. Camp's clearly established rights under *Brady v. Maryland* and its progeny and, as such, violated Mr. Camp's right to a fair trial under the Fourteenth Amendment to the U.S. Constitution.

### Count 4
### Plaintiff v. Defendant City of Philadelphia
### 42 U.S.C. § 1983:  Municipal Liability Claims

89. Defendant City of Philadelphia caused the violation of Mr. Camp's constitutional rights. As evidenced by the lengthy history of scandals involving officers' use of informants in general, and credible reports of Nordo's conduct in particular, the City, with deliberate indifference, employed a custom, pattern, practice, or policy of allowing officers to misuse confidential informants and/or failed to train, supervise, and/or discipline officers who engaged in such conduct. The misuse of confidential informants to which the City was deliberately indifferent included officers:

   a. Making false statements or reports in order to help or protect informants;

   b. Making false statements or reports regarding the information provided by informants;

   c. Developing inappropriate personal relationships with informants, including sexual relationships;

   d. Coercing or threatening informants to provide information;

   e. Providing financial rewards to informants; and/or

    f. Attempting to reduce the prison time or change the custody status of informants.

## Count 5
## Plaintiff v. Defendant Nordo
## Pennsylvania State Law Claim: Malicious Prosecution

90. Defendant Nordo's knowing, intentional, and/or reckless false statements were the direct and proximate cause of the prosecution of Mr. Camp on illegal firearm possession charges. Nordo caused the prosecution on the firearm charges without probable cause and he acted with malice or specific intent to injure.

91. Mr. Camp suffered a deprivation of liberty as a result of the prosecution. Mr. Camp's conviction on the illegal firearm possession charges was vacated and the charges were withdrawn. The prosecution therefore terminated in Mr. Camp's favor.

**Wherefore**, plaintiff Gerald Camp respectfully requests:

A.  Compensatory damages as to all defendants;

B.  Punitive damages as to defendant Nordo;

C.  Reasonable attorneys' fees and costs as to all defendants;

D.  Such other and further relief deemed just and appropriate.

Plaintiff hereby demands a jury trial.

Susan M. Lin
PA I.D. No. 94184
slin@krlawphila.com

Jonathan H. Feinberg
PA I.D. No. 88227
jfeinberg@krlawphila.com

KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
(215) 925-5365 (fax)

*Counsel for Plaintiff*